

U.S. Department of Justice

United States Attorney
Eastern District of New York

DMP
F.#2008R00241

271 Cadman Plaza East
Brooklyn, New York 11201

January 4, 2019

<u>By Hand and ECF</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:   <u>United States v. Wendell Alomar-Cabrera</u>
              <u>Criminal Docket No. 08-115 (S-4) (NGG)</u>

Dear Judge Garaufis:

       The government respectfully submits this letter in advance of the upcoming sentencing of the defendant Wendell Alomar-Cabrera, which is currently scheduled for January 31, 2019, at 11:30 a.m.  For the reasons that follow, the government respectfully requests that the defendant be sentenced within the applicable advisory Sentencing Guidelines range of 292 to 365 months' imprisonment.

    I.      <u>Offense Conduct</u>

       On November 15, 2013, the defendant pleaded guilty to Count 4 of the superseding indictment, charging him with using a firearm in connection with the October 16, 2006 murder of Luis Sifuentes.  (Presentence Investigation Report ("PSR") ¶ 1). This brutal murder took place during the course of a drug robbery, as the defendant and a number of co-conspirators abducted Sifuentes in order to rob him of drugs and drug money. (PSR ¶ 10).  In addition to his involvement in the murder of Sifuentes, the defendant is responsible for approximately 15 other drug robberies, as described in the PSR.  (PSR ¶ 2-13).

       In summary, the defendant was part of a violent robbery crew that committed armed robberies of drug dealers in the hopes of stealing drugs or drug money.  (<u>Id</u>.).  The robbery crew committed hundreds of robberies and attempted robberies in New York, Pennsylvania and North Carolina, among other states.  (<u>Id</u>.).  Members of the crew often impersonated police officers and in some cases committed robberies with actual police

officers, using cars equipped with lights and sirens to pull over victims and entering victims' homes dressed as police officers. (Id.). During these robberies, members of the crew shot, tortured, kidnaped, assaulted, and physically restrained their victims, many of whom were drug dealers involved with Mexican cartels. (Id.). Forms of torture included beating victims severely, including with pistols, burning victims with hot irons, submerging victims' heads underwater to simulate drowning, and threatening to cut off body parts. (Id.). As a result of these robberies, the crew stole hundreds of kilograms of cocaine and other drugs and hundreds of thousands of dollars in drug money. (Id.). Because drug dealers generally do not call the police to report the theft of drugs or drug money, most of the robberies were not reported and the victims were not identified.

    A. <u>The Kidnaping and Murder of Luis Sifuentes</u>

Notably and most significantly, Alomar-Cabrera participated in October 16, 2006 robbery, kidnaping and, ultimately, murder of Luis Sifuentes. (PSR ¶ 10-11).

In the early morning hours of October 16, 2006, several members of the robbery crew kidnaped Sifuentes shortly after he left a nightclub called "Illusions" in Durham, North Carolina. While at "Illusions," members of the robbery crew identified Sifuentes as a drug dealer. As a result, the crew decided to kidnap Sifuentes in an effort to rob him of any drugs and drug money. Members of the crew waited for Sifuentes to leave the club and used pre-installed "lights and sirens" on one of their vehicles to execute a car stop when Sifuentes drove off in his pick-up truck. Sifuentes was forced out of his truck, handcuffed and driven to a house used by one of the members of the robbery crew. Alomar-Cabrera was at the nightclub with the other members of the robbery crew earlier that evening, but left the nightclub prior to the abduction of Sifuentes.

En route to the house, several members of the robbery crew assaulted Sifuentes and demanded that he provide information regarding the location of drugs and money. Sifuentes did not provide any information at that time. Once they arrived at the house, members of the robbery crew carried Sifuentes into a first floor bathroom and continued to assault him. During the assault, Sifuentes indicated that he had drugs and money hidden in his truck, from which he had been kidnaped. One member of the crew called Alomar-Cabrera and another crew member to retrieve Sifuentes's truck, which they did, but no money or drugs were recovered from the truck.

Members of the robbery crew, including Alomar-Cabrera, then resumed beating Sifuentes with their fists and with a wood stick. Repeatedly during the beating, Sifuentes's head was held under water in a bathtub for sustained periods of time. At one point, another member of the robbery crew heated a knife on a stove and pressed it against Sifuentes's bare skin. Sifuentes had bruises on his body and was bleeding from his mouth as a result of the beating.

Throughout the early hours of the morning of October 16, 2006, Alomar-Cabrera and two other members of the robbery crew continued to beat the victim. At some

point in the early morning, Sifuentes stopped resisting. One member of the robbery crew checked Sifuentes's pulse and determined that his heart had stopped. An argument broke out among Alomar-Cabrera and several other members of the robbery crew about who was responsible for Sifuentes' death.

Thereafter, members of the robbery crew wrapped Sifuentes's body in sheets or a rug, carried the body out of the house, and placed the body inside the cab of Sifuentes's pickup truck. Two members of the robbery crew drove Sifuentes's truck to an isolated location. Alomar-Cabrera and another crew member drove a different vehicle to a gas station to get a container of gasoline, and then met the other two crew members with the victim's body and truck.

The crew members parked Sifuentes's truck in a wooded area. Alomar-Cabrera poured the gasoline throughout Sifuentes's truck and set the truck on fire, with Sifuentes's body inside the truck. After disposing of Sifuentes's body, Alomar-Cabrera discovered that he had lost his wallet. Alomar-Cabrera and other crew members returned to where they had left Sifuentes to see if they could find the wallet. By the time they reached the location of the body, the police and fire departments had already arrived, so they left. At the crime scene, law enforcement officers recovered a brown leather wallet containing a driver's license in Alomar-Cabrera's name.

The medical examination of Sifuentes's body revealed that Sifuentes was shot twice in the back and that he died of the gunshot wounds. Alomar-Cabrera either shot the firearm that ultimately killed Sifuentes or he was present when Sifuentes was finally killed.

B. The Defendant's Participation in Other Drug Robberies

In addition to his participation in the Sifuentes homicide, Alomar-Cabrera participated in approximately 15 robberies or attempted robberies of drug traffickers, in the Bronx, Queens, and North Carolina. (PSR ¶ 12.) These were violent robberies, nearly all of which involved firearms, and several of which included gunfights or police-style raids. Many of them also involved the torture and restraint of numerous victims.

Several robberies involved exchanges of gunfire between the robbery crew and the drug dealer victims that could have led to other deaths. For instance, in one robbery, members of the robbery crew pushed into a trailer and held one victim at gunpoint before another victim starting firing at members of the robbery crew with an AK-47, leading to an approximately 10-15 minute gunfight. (PSR ¶ 12(d)). In a second robbery, crew members tried to break down a door and enter through the window of a victim residence. A male inside the residence started to fire on the robbery crew members with an AK-47, and all crew members returned fire. (PSR ¶ 12(m)). In at least 10 robberies, Alomar-Cabrera personally possessed a firearm. (PSR ¶ 12).

Several other robberies featured the robbery crew conducting violent, police style raids on houses occupied by many victims. For instance, in one robbery, one victim

3

disclosed a location where members of the robbery crew could find drugs and money. The crew conducted a police-style raid on the location, in which 15 women and children were inside. The crew recovered approximately $300,000 and two guns, and then used the women as hostages to obtain additional drugs. (PSR ¶ 12(e)). In a second robbery, the crew abducted a male victim with his 3-4 year old daughter, leading to information about the location of a stash house. The crew conducted a police-style raid on the stash house, handcuffing two occupants, and recovering 10-15 kilograms of cocaine and two guns. (PSR ¶ 12(f)).

Other robberies involved the use of various methods of torture during which the crew tried to obtain information about the location of drugs and drug proceeds. In one robbery, Alomar-Cabrera dunked a victim in a tub of water to simulate the sensation of drowning, while other members of the robbery crew beat a victim with a window shade rod, hung multiple victims by their hands and beat them with sticks, threatened to cut off the penis of a victim, and fired rounds of ammunition in the air. (PSR ¶ 12(g)). In other robberies, members of the robbery crew beat victims, handcuffed victims, and dunked victims in tubs of water to simulate the sensation of drowning in order to get the victims to reveal the location of drugs. (PSR ¶ 12(c), (i), (k)).

In many of the robberies, members of the robbery crew impersonated police officers. For instance, one robbery involved members of the robbery crew stopping a victim while pretending to be police, abducting the victim, and then beating him to elicit information on the location of drugs and drug money. (PSR ¶ 12(n)). In other robberies, Alomar-Cabrera personally wore police gear to pretend to be law enforcement in stopping victims. (PSR ¶ 12(h), (l)).

Finally, Alomar-Cabrera also participated in the robbery of a jewelry store in Manhattan, during which he and a fellow crew member grabbed the owner and an employee at gunpoint and then handcuffed them with flex cuffs. In addition, the crew tried to restrain another worker and customer, but the customer resisted, leading Alomar-Cabrera to hit him with a plastic mini vacuum. The crew stole cash, diamonds, watches and jewelry. (PSR ¶ 12(o)). The victims of this robbery reported that the robbers stole approximately $60,000 in cash and $300,000 to $500,000 in jewelry.

Not including the cash and jewelry from the jewelry store robbery, the crew obtained 79 to 84 kilograms of cocaine,[1] an unknown quantity of marijuana, more than $1.3 million in cash, and at least 8 guns from these 15 drug robberies in which Alomar-Cabrera participated. (PSR ¶ 12).

---

[1] In its descriptions of several of these robberies, the PSR describes the type of drugs obtained from the robberies as unknown. In each instance, the drug involved was cocaine.

4

II.   The Statutory Sentencing Scheme and Guidelines Calculation

As a result of his plea to a firearms-related murder in violation of Title 18, United States Code, Section 924(j), the defendant faces a statutory sentencing range of 10 years to life in prison.

At the time of his guilty plea in 2013, the government indicated in the plea agreement that there was no statutory minimum sentence for a 924(j) conviction. Subsequent to the defendant's plea, the Second Circuit has clarified that a defendant convicted of murder under § 924(j) faces a mandatory minimum of 10 years, because it incorporates the mandatory minimum sentencing scheme outlined in § 924(c). See United States v. Young, 561 F. App'x 85, 93 (2d Cir. 2014) (summary order) (holding that 924(j)(1) "incorporates the entirety of [Section 924(c)], including its enhanced penalties"); United States v. Nina, No. 16-909-cr, 2018 WL 2251628 at *6-7 (2d Cir. May 17, 2018) (summary order) (noting that "a number of our sister circuits have held that section 924(j) incorporates the entirety of section (c)" and holding that section 924(j) incorporated consecutive sentence provision of section 924(c)).

Under the plea agreement, the defendant faces a Guidelines range of 292 to 365 months' imprisonment, a range to which the defendant stipulated in his plea agreement. Specifically, the base offense level is 43, pursuant to Guidelines Section 2A1.1(a). The defendant receives a two-level enhancement for restraint of a victim, a three-level reduction for acceptance of responsibility, and an additional two-level reduction for a global disposition, yielding a total offense level of 40.[2]

With a total offense level of 40 and a criminal history category of I, the advisory Guidelines range is 292 to 365 months' imprisonment.

III.   The Appropriate Sentence

In consideration of the factors set forth in Title 18, United States Codes, Section 3553(a), the government submits that a sentence within the Guidelines of 292 to 365 months in prison is appropriate. The Guidelines range reflects the seriousness of the defendant's conduct, the need to promote respect for the law, and the need to provide adequate deterrence to the defendant and to others contemplating similar acts. See 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B).

---

[2] The PSR does not recognize the two-level reduction for a global disposition as part of the offense level calculation, and therefore calculates a total offense level of 42 and a criminal history category of I, which yields a Guidelines range of 360 months to life imprisonment. (PSR ¶ 67). However, the PSR notes that the two-level reduction for a global disposition may be considered as a factor that may warrant a downward departure. (See PSR ¶ 79 & page 18, note 1).

5

The defendant's conduct in this case is quite serious. The defendant committed approximately 15 robberies of drug dealers in an effort to obtain drugs or drug money. During the most serious of these robberies, the defendant and other members of the robbery killed their victim by beating him, shooting him and setting his body of fire. This was not an isolated incident. Other robberies included shootouts between the robbery crew and their victims, which did not cause any other deaths but carried such a risk. In still other robberies, the defendant and other members of the robbery crew committed severe forms of torture, including beating victims, waterboarding them, and threatening them by firing guns and threatening to cut off body parts. Numerous victims were abducted and restrained during these robberies, and some of the victims included women and children.

The defendant, in his submission to the Court, seeks a substantial departure from the Guidelines, advocating for a sentence of eleven years in prison. Defense counsel credibly suggests that the defendant should be given credit for the efforts he undertook during the commission of a brutal robbery to stop a co-defendant, Gabriel Pabon, from raping a young girl. While his efforts in that regard are worthy of the Court's consideration, it must be contrasted with Alomar-Cabrera's willingness to steal and sell massive amounts of narcotics, and his willingness, repeatedly, to rob and torture victims. Indeed, and most significantly, only a sentence within the Guidelines would appropriately hold Alomar-Cabrera accountable for the brutal kidnaping and murder of Luis Sifuentes.

IV. Conclusion

For the foregoing reasons, the government respectfully submits that a sentence within the Guidelines range of 292 to 365 months in prison would be appropriate.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Douglas M. Pravda
Assistant U.S. Attorney
(718) 254-6268

Jeremy Shockett
Special Assistant U.S. Attorney